HOAGLAND WAGON COMPANY, Respondent, v. LONDON GUARANTEE and ACCIDENT COMPANY, a Corporation, Appellant.

Kansas City Court of Appeals, May 5, 1919.

1. **INDEMNITY INSURANCE:** Insolvency of Insured: Payment of Judgment. A corporation, which pays a judgment obtained against it by an employee injured through its negligence, may recover on a policy of insurance indemnifying it for loss from any liability

that might be imposed upon it by law on account of injuries sustained by an employee, even though at the time the judgment was paid the corporation was insolvent.

2. ———: Issues. The only issue in a suit on such a policy is the question of whether or not plaintiff actually paid the judgment, the motive of the plaintiff being of no consequence.

3. ———: Vexatious Delay. Where the defendant repeatedly refused to satisfy the judgment obtained against the plaintiff, failed to give bond on appeal and counseled the plaintiff to turn over its business to a stockholder in order to frustrate collection of the judgment there was sufficient evidence to support a finding that defendant's refusal to pay was vexatious.

4. ACTIONS: Real Party or Interest. Plaintiff gave a note for money obtained to pay a judgment against it and pledged the policy sued on in this suit as security therefor. *Held,* plaintiff is the real party in interest.

Appeal from Jackson Circuit Court.—*Hon. Clarence A. Burney,* Judge.

AFFIRMED.

*Burke & Kimpton* for respondent.

*Battle McCardle* for appellant.

BLAND, J.—This is a suit upon an employer's liability policy of insurance. Plaintiff recovered a verdict and judgment and defendant has appealed. The policy indemnified plaintiff against loss from liability that might be imposed by law upon it , for damages on account of death or bodily injuries suffered as the result of accident occurring to employees of the plaintiff, not to exceed five thousand dollars for death or injury to one or ten thousand dollars to more than one. At the time the policy was issued plaintiff was engaged in the manufacture and repair of wagons in Kansas City, Missouri. While the policy was in force and on June 26, 1914, one Harry Lindelof, an employee of the defendant, was injured and filed suit against this plaintiff on the 13th day of August, of that year, to recover damages in the sum of ten thou-

sand dollars for such injuries. Defendant was notified of the accident and suit and after investigation undertook the defense of the action. On June 17, 1915, judgment was rendered in the circuit court in favor of Lindelof in the sum of five thousand dollars. The case was appealed to this court by the defendant, without any *supersedeas* bond being given, and on May 22, 1916, the judgment was affirmed.

After the affirmance of the judgment plaintiff attempted to get defendant to satisfy the judgment but defendant refused to do so and, finally, plaintiff borrowed the money with which to pay the judgment, costs and interest, which it paid. After making repeated demands upon defendant to reimburse it for the outlay and upon the refusal of defendant to do so, plaintiff brought this suit, which resulted in a verdict and judgment for plaintiff in the sum of $6966.79, being the amount of the Lindelof judgment, costs and interest thereon, and attorneys' fees and penalties for vexatious refusal to pay. The judgment included $500 penalties and $500 attorneys' fees.

As matters of defense to this action, defendant set up in its answer an admission of the execution of the policy and a denial of each and every other allegation in the petition, and by way of special defense pleaded that paragraph two of the policy provided that defendant should indemnify plaintiff against *loss* from liability imposed by law upon plaintiff for damages, and that Clause H, Section 3, provided that no action should be brought against defendant to recover for any loss or expense under the policy unless it be brought by the assured "for loss or expense actually sustained and paid in money by assured." The answer further alleged that plaintiff had not actually sustained any such loss or expense, that it had not paid in money any such loss or expense; that if there was any settlement between plaintiff and Lindelof, the same was made voluntarily by plaintiff and of its own accord and no loss or expense was actually sustained; that at the time of the alleged payment of the Lindelof judgment

plaintiff was insolvent and had discontinued business; that its charter had been revoked by the state; that it had conveyed all of its property to trustees for the benefit of creditors and had no intention of resuming business, and that judgment could not be collected against plaintiff; that under the provisions of the policy it was the duty of plaintiff not to incur voluntarily and unnecessarily any loss, and that if any settlement by plaintiff was made, it was not a bonafide one but was a pretended one, and that it was made for the purpose of defrauding the defendant. The reply was a general denial.

The facts in reference to the settlement and payment of the judgment show that John Hoagland was a wagon maker and had followed his trade in Kansas City for about thirty-three years. In the year 1909 he incorporated his business with a capital stock of four thousand dollars, the stockholders being himself and his three sons. In January, 1914, this policy was issued. On December 14, 1914, a few months after the Lindelof suit was brought and before its trial, plaintiff made an assignment for the benefit of creditors, owing at the time about forty-five hundred dollars and having assets of three thousand dollars. The company thereafter settled up the matter by paying its debts in full. This left remaining only the obligation of the Lindelof claim. Defendant must have known of the financial condition of plaintiff, for the reason that an appeal of the Lindelof case was taken without giving a *supersedeas* bond, yet defendant continued in charge of the defense.

On April 17, 1915, after the Lindelof suit was brought but before its trial, the "physical" assets of the property were sold, but the good will and name were not included in the sale. On May 26, 1915, Joseph L. Hoagland, one of plaintiff's stockholders and directors, on the letter head of plaintiff, sent out circular letters to two hundred and fifty customers of plaintiff stating that the Schaeffer Wagon Company had not, as it had claimed, purchased the stock and business of the Hoagland Wagon Company but that the Hoagland

Wagon Company "is still in existence;" "we have not sold the shares or good will of the business;" "neither did we agree to allow them to use our name in connection with their business. However, we did sell all our equipment and material." The letter further stated that the company was equipped with new machinery and a new stock of material and that after June 7th it would be ready to carry on the business as usual. The letter was signed by Joseph L. Hoagland. On July 8, 1915, three weeks after Lindelof recovered judgment in the circuit court, plaintiff held a directors' meeting at which all of the stockholders were present and resolved that the remaining assets and the good will of the company be turned over to Joseph L. Hoagland, and that the business of the company be carried on by Joseph L. Hoagland in his name and that he adjust all claims against the corporation "he thinks proper." Neither plaintiff nor Joseph L. Hoagland had an attorney but Joseph L. Hoagland sought legal advice from Mr. Barry, an attorney representing this defendant. Barry advised him about the time the company was taken over by the latter, to use his, Joseph L. Hoagland's, individual name in conducting the business. In accordance with this resolution of plaintiff the remaining property of every description was turned over to Joseph L. Hoagland, one of the stockholders. This property consisted of the good will, the name and about four hundred dollars in book accounts. At the time of the turning over of the remaining assets of the company to Joseph L. Hoagland the stockholders consisted of John Hoagland and his two sons, F. J. and Joseph L. Hoagland, and at that time all but two shares of the stock which were retained, one each by John Hoagland and F. J. Hoagland, were turned over to Joseph L. Hoagland. Since that time the plaintiff has held all regular and special corporation meetings. After the company's business was run in the name of Joseph L. Hoagland, the latter paid off its indebtedness except the Lindelof judgment, and ran a thriving business.

There was evidence that the charter of the corporation was allowed to lapse through an oversight in failing to make reports to the Secretary of State but that it had been renewed, the forfeiture having been set aside. Since the turning over of the remaining assets to Joseph L. Hoagland, the company (unless Joseph L. Hoagland's business was its business), ceased to have a place of business and had transacted no business except the holding of corporation meetings and had no plans for the resumption of business at the time this suit was tried, but the company had not given up the idea of resuming business at that time. On the contrary the Hoaglands intended to turn back the business to the Hoagland Wagon Company, this plaintiff, as soon as the Wade note that it owed was paid off. The Wade note was given by plaintiff in borrowing the money to pay off the Lindelof judgment. The inference being that plaintiff expected to pay off the note from the proceeds of this insurance policy. The evidence shows that the business would have been turned back to plaintiff company even before the Wade loan was made had it not been for the Lindelof judgment hanging over the company. After the business was turned over and conducted in the name of Joseph L. Hoagland, Lindelof had an execution issued on his judgment and garnished various creditors of Joseph L. Hoagland. On June 19, 1916, Barry wrote Joseph L. Hoagland a letter acknowledging receipt of the latter's letter inclosing copy of summons of garnshee and saying that he wished to advise that the defendant's attorneys would give this matter attention and that Hoagland need not pay any further attention to the matter and that if anything came up defendant's attorneys would take the matter up with him. The letter further stated that the summons was an attempt on the part of Lindelof's attorneys to find out whether Joseph L. Hoagland had any property of the Hoagland Wagon Company in his possession. Barry states, *"that, of course, you have not but before filing an answer we will consult with each of you."* The letter

finally concludes by the further statement that this defendant would see that Joseph L. Hoagland was not further troubled about the matter and if anything further transpired that said Hoagland was to consult one of defendant's attorneys. Barry had some of the garnishments released. All of these facts are undisputed.

About this time Mr. Kimpton, a lawyer in Kansas City, came down to Hoagland's office and asked regarding the Lindelof judgment, stating that he desired to get information for some hardware firm, retailers association or credit association; that he represented some firm back east that wanted to know something of Hoagland's credit standing, and it was in this way that Hoagland met Kimpton.

On July 8, 1916, plaintiff held a directors' meeting; this meeting was had "on account of difficulties which had arisen in the matter of Harry Lindelof and on account of trouble caused by legal proceedings in the matter." At that meeting plaintiff resolved that steps be taken to get the necessary money to pay the Lindelof judgment, and that legal advice be obtained to take action to compel the defendant to repay the Hoagland Wagon Company the amount to be paid out by it in settlement of such judgment. Thereafter plaintiff employed Kimpton to assist them in carrying out these purposes.

A witness testified that these garnishments paralyzed the Hoagland credit and was embarassing to the business in many ways. Lindelof's attorney was threatening to bring receivership proceedings against Joseph L. Hoagland on the theory that the Hoagland Wagon Company was not defunct but was carrying on its business through Joseph L. Hoagland. Kimpton testified that he regarded Joseph L. Hoagland's business as nothing more than the business of the Hoagland Wagon Company and if Lindelof's attorneys took the threatened action, it might be sucessfully prosecuted and Joseph L. Hoagland ruined. Kimpton pressed the matter of paying the judgment with the

defendant but nothing was done by it toward adjusting the judgment. Thereupon Kimpton, being given authority by the Hoaglands, arranged with a client of his, one George L. Wade, for the latter to loan to plaintiffs the amount necessary to pay off the Lindelof judgment, interest and costs; plaintiff to give to Wade as security for the loan of the policy now sued upon. This arrangement was made with Wade, and he loaned plaintiff the sum of $5660 and the Lindelof judgment, interest and costs was paid. Kimpton advised Wade that the policy was good security for the loan. Kimpton testified that he thought the policy was good security for the loan and that in his opinion the Hoagland Wagon Company, a corporation, and Joseph L. Hoagland, an individual, were one and the same, and that Joseph L. Hoagland had a prosperous business. Kimpton told Wade of the circumstances surrounding the situation. Joseph L. Hoagland had borrowed money from the bank to use in his business. Wade had been Kimpton's client for seven or eight years.

Wade was the owner and operator of eight or more railway sleeping cars with cooking outfits, and he had been in that business for two or three years before he loaned the money to plaintiff. Wade did not testify; he was evidently not in the city as he could not be found by subpoena server. But Kimpton said that he had handled loans for Wade; that the total amount of loans he had made for Wade was about $25,000 or $30,000 and that the largest single loan was for $8500. Wade's Banker stated that he would loan Wade money at any time and had loaned him money. The matter of the loan between plaintiff and Wade was made through Kimpton. There was a conference between Joseph L. Hoagland and Wade of about thirty minutes but the witness testifying to the same could not remember what was said. At the time Joseph Hoagland, on behalf of the plaintiff, executed a note signed Hoagland Wagon Company by Joseph Hoagland, for $5660 payable to George L. Wade, the latter gave a

check to Hoagland, payable to the Hoagland Wagon Company, for that amount on the Traders National Bank of Kansas City, and Kimpton, as attorney for plaintiff, cashed the check and paid the money to the clerk of the circuit court of Jackson County, and the amount of the Lindelof judgment with interest and costs was satisfied. This whole proceeding was authorized or at least ratified by plaintiff at a director's meeting.

It is contended by the defendant that the policy was one of indemnity and if any money was actually paid by Wade to plaintiff and it was afterwards paid into court in satisfaction of the judgment, it was "a voluntary payment not made to prevent loss or seizure of property under execution, but collusively made by virtue of and understanding between the Wagon Company, the Assured, and the attorney of Lindelof, by which the money should be borrowed not to avert loss" (as defendant says plaintiff was insolvent and out of business) "but to bring on an alleged loss so that ground might be laid for a suit to compel" defendant to pay the loss. That payment of the judgment under the circumstances was a fraudulent creation or acceleration of a loss by the plaintiff; that it was the duty of the plaintiff to act in good faith toward the defendant and not to do or suffer to be done any act which could expose it to jeopardy or willful loss; that the loss was wilfully occasioned and for these reasons the defendant was discharged. We think there is no merit in this contention. The payment was not voluntary, but was made under the duty imposed by law upon the plaintiff to either settle the judgment or, if it could not be settled, to pay it as directed by this court, whether it was solvent or insolvent. [Mining Co. v. Casualty Co., 162 Mo. App. 178, l. c. 185, 190.]

It is with very poor grace that defendant urges that plaintiff should not have paid this judgment. A court of last resort had adjudged the judgment to be just one and that it should be paid. Instead of permitting plaintiff to pay the judgment, defendant used all the

means at its command to prevent its payment, evidently knowing that it would be the final loser. Defendant not only refused to pay or to refund to plaintiff the amount of the judgment, but even before it was rendered advised plaintiff to circumvent its payment by fraudulently running the business in the name of one of its stockholders, Joseph L. Hoagland. Not only this, but after the business was placed in the name of Joseph L. Hoagland and the suit had come to trial resulting in a judgment, defendant offered legal aid to plaintiff to defeat the execution issued on the judgment. Defendant now claims it never became liable to pay the Lindelof judgment and thus places itself in the position of advising and assisting plaintiff and Joseph L. Hoagland, to whom it owed no resposibility whatsoever, to fraudulently attempt to defeat a judgment of a court of last resort. Unless the mandate of our courts are to be flagrantly disobeyed and laughed at and the administration of the law defeated, such a practice must be disapproved. Plaintiff in its brief touches on this subject but gingerly and we would have no hesitancy in including plaintiff in the disapprobation if it were not for the fact that it was perhaps only partially to blame and that only at the start of the transaction, but, afterwards, as the jury has found, made a praiseworthy effort to right its wrongs and borrow the money with which to comply with the mandate of the court and pay off the judgment. We say it may be that plaintiff was only partially to blame in taking the method it did to defeat the collection of the judgment because it was without the advice of its own legal counsel but depended upon that of defendant's which made the conduct of defendant much more culpable. The evidence far from shows that plaintiff was out of business when it paid off this judgment and the only reason that there is any dispute about it at all is that defendant if it did not instigate the scheme to defeat the collection of the judgment, aided and abetted such a plan by advising plaintiff to turn its business and assets over to one of its stockholders.

It is further contended by defendant that no money was actually loaned by Wade to the plaintiff; that the transactions had in reference to the alleged loans were merely colorable; that Wade did not have the money to lend, "and that it challenges credence that a mere stranger would have loaned without security the sum of $5660 to an insolvent corporation, whose capital stock was only $4000." There was no substantial evidence that Wade did not have the money to lend. It is true that he had a mortgage on his residence and defendant introduced evidence tending to show that his personal property tax return in 1917 showed a valuation of $2650; in 1916, a valuation of $2450 and a very little of the property listed in those returns consisted of cash. There was evidence that Wade was engaged in a substantial business and that he loaned thousands of dollars. People of money often have mortgages on their property and, unfortunately, it is a common occurrence for persons to greatly undervalue their personal property when making tax returns. Wade made the loan on the recommendation of his attorney who had loaned large sums of money for him previously. The attorney thought this policy was good security and that Joseph L. Hoagland had a prosperous business, and that the business he carried on was that of the plaintiff. It may be assumed that Wade acted upon the advice of his attorney. While the capital stock of the plaintiff was only $4000 it was that same amount when defendant issued this policy and insured plaintiff for the maximum sum of ten thousand dollars. It is not unbelievable that a corporation may borrow money in excess of its capital stock. While it might be contended by way of argument that the circumstances surrounding the manner in which the money was borrowed and the judgment paid off, was only consistent with some pre-arranged plan to discharge the judgment through subterfuge and not by actual payment of money and thus avoid the terms of the policy, yet there is evidence from which the jury could say that the transaction was had in good faith.

The argument is made that the Lindelof judgment was paid off by plaintiff in order to save Joseph L. Hoagland, a stranger   to this contract of insurance, from embarrassment of garnishments and, therefore, the same was not paid in "good faith." It matters not what may have been the motive actuating plaintiff in paying off this judgment. One of the Hoaglands testified that his family had been in business for a great many years and that it always paid its debts and did pay this judgment to save its good name. The matter of good faith goes only to the question as to whether the judgment was actually paid, or whether a form of payment was gone through that amounted to a mere sham or colorable transaction and not actual payment. [Stenbohm v. Brown-Corliss Engine Co., 119 N. W. 308 (Wis.); Taxicab Motor Co. v. Pacific Coast Casualty Co., 132 Pac. 393 (Wash.); Davies v. Maryland Casualty Co., 154 Pac. 1116 (Wash.); Rodgers v. Pacific Coast Casualty Co., 164 Pac. 1115 (Cal.); Kennedy v. Fidelity and Casualty Co., 100 Minn. 1.]

Defendant complains of the giving by the court of plaintiff's instruction which told the jury that "plaintiff had the right in good faith to pay the Lindelof judgment mentioned in evidence and if you believe and find from the evidence that on July 20, 1917, the plaintiff in good faith actually paid into court in satisfaction of said judgment the sum of $5675.45 in money and that demand was made upon the defendant therefor, then you should return a verdict in favor of the plaintiff for said amount, together with interest thereon, at six per cent per annum from the date of such demand to the present time." It is contended that this instruction did not require the jury to find any of the facts on which recovery by plaintiff depended; that the instruction does not require the jury to find from the evidence that there had been a compliance with the terms of the policy. The only issue of fact in the case was whether or not the money was actually and not merely formally paid by plaintiff to saitsfy the Lindelof judgment. As we have before stated, plaintiff did not wrongfully accelerate

the loss or make the payment voluntarily, but that it was plaintiff's duty, after the affirmance of the judgment by this court, to pay or settle it whether plaintiff was solvent or insolvent. All this, of course, is true as a matter of law and should not have been submitted to the jury. The instruction therefore submitted the only issue of fact in the case, that is, whether there had been a payment in good faith of the judgment.

It is further contended that interest on the amount of the original judgment cannot be recovered for any time prior to the filing of this suit. This contention is ruled against defendant. Section 2 of the policy provides "The indemnity limits shall be . . . (5) All interest accruing after entry of judgment upon such part thereof as shall not be in excess of the limits of the company's liability as herein expressed." In other words the defendant agreed to be liable for interest on not to exceed $5000 of any judgment recovered against plaintiff by one of its employees. The judgment recovered by Lindelof was for $5000. Defendant owed plaintiff the amount of this judgment, interest thereon and costs (See, also, Century Realty Co. v. Ins. Co., 179 Mo. App. 123), and after demand for the whole was made upon defendant by plaintiff defendant thereafter. became liable for the statutory interest of six per cent on the whole sum due from the date of the demand.

The court properly refused defendant's instruction No. 2. This instruction is not easy to understand but it apparently sought to submit to the jury the two questions, intermingled, whether the judgment in good faith was paid and whether it was proper for plaintiff to pay it under the circumstances. The latter question was one of law as already stated. Instructions Nos. 3 and 4 sought to submit to the jury the question of plaintiff's motive in paying off the judgment and for that reason they were properly refused. Instruction No. 5 sought to submit a question of law to the jury, that is, whether plaintiff was insolvent and compelled to pay

the judgment in view of that fact. It was properly refused.

Defendant urges that the action was not brought in the name of the real party in interest. The policy was pledged to secure the payment of the note. It was provided in the written agreement by which the pledge was made that plaintiff should file and prosecute this suit and not until plaintiff failed to do so would Wade have any right so to do. Under the terms of the agreement Wade did not have a right to bring this suit. The policy belonged to the plaintiff and remained its property until default was made under the terms of its agreement with Wade. At least until there had been a default in the payment of the note plaintiff had a right to prosecute the suit. [Dickey v. Porter, 203 Mo. 1; Key ex rel. v. Ins. Co., 101 Mo. App. 344.]

Defendant urges that this suit is prosecuted for the benefit of Wade and, therefore, no damages for vexatious refusal to pay or for attorneys fees could be awarded. We have already stated that plaintiff had an interest in the controversy and had a right to bring this action, and we have no doubt that it had a right to recover statutory damages and attorneys' fees.

There was sufficient evidence to go to the jury on the question of whether the refusal to pay was vexatious. The evidence in this case shows that from the very beginning the defendant was attempting to avoid paying the Lindelof judgment. He gave no *supersedeas* bond when it appealed that judgment to this court. It went to the extent of advising the Hoaglands to carry on the business of the Wagon Company in the individual name of Joseph L. Hoagland, even before the judgment was rendered, in order to defeat its collection, and it offered to help and actually assisted Joseph L. Hoagland in attempting to defeat the garnishments run by this plaintiff on Hoagland's creditors. If defendant did not actually concoct a scheme whereby the business of plaintiff was turned over to Joseph L. Hoagland to defeat Lindelof in the collection of his judgment, it aided and abetted the scheme to frustrate the collection of that

judgment declared to be justly rendered by a court of last resort. This conduct on defendant's part amounted to an effort to defeat the ends of justice. As already stated plaintiff's conduct would have been just as reprehensible as that of defendant had plaintiff not desisted in its efforts and finally did the praiseworthy thing in making arrangements to pay and actually paying his judgment (at least the jury so found). Plaintiff was placed in this embarrassing position, at least in part, by defendant's advice and refusal to pay off the judgment. Although we are not wholly exonerating plaintiff for what it did, however, when plaintiff paid off the judgment this defendant should have reimbursed it at once, if the transaction was a real and not a sham one. The only real issue in the case was whether or not the judgment was actually paid. Defendant had ample opportunity to investigate and find out whether this was true or not, and at the trial introduced no evidence except the mortgage and tax returns of George L. Wade, which were of little probative force. We think there was sufficient evidence from which the jury could say that the refusal to pay was vexatious.

The judgment is affirmed. All concur.