# K. M. PATTEN, Respondent, v. CHARLES THOMAS, Appellant.

### In the Kansas City Court of Appeals, December 4, 1922.

1. **APPEAL AND ERROR: On Appeal, Evidence Reviewed in Most Favorable Light to Successful Party.** On appeal from a judgment for plaintiff where defendant insists plaintiff is not entitled to recover under the facts, the evidence must be stated in the most favorable light to plaintiff.

2. **DRAINS: Lateral Ditch: Overflow: Proximate Cause: Defendant Held Liable for Overflow of Lands Resulting in Loss of Corn Crop Where Damming of Lateral Causing Same Was One of Proximate Concurring Causes.** In an action to recover damages for the damming of the head of a lateral where it connected with a lateral on the South side of plaintiff's lands which connected with main drainage ditch, resulting in the overflow of plaintiff's land and loss of corn crop, defendant *held* liable even though subsequent rains contributed to plaintiffs being unable to cultivate the corn, if the stopping of the lateral causing the overflow was one of the proximate concurring causes.

3. ————: ————: ————: ————: **Evidence Held Sufficient to Establish That Damming of Lateral Resulting in Loss of Corn Crop was Proximate Cause.** In an action to recover damages for loss of corn crop as result of overflow of lands caused by damming the head of a lateral, evidence *held* sufficient to establish that the damming of lateral was proximate cause of plaintiff's damage.

4. ————: ————: ————: **Negligence: In an Action to Recover, Damages for Overflow of Land, Plaintiff Held not Guilty of Contributory Negligence in Preventing Overflow of Land.** In a suit to recover damages for damming the head of a lateral resulting in overflow of land and destroying corn crop, the plaintiff *held* not guilty of contributory negligence as a matter of law in filling up ditches running from his land into a lateral to prevent water from flowing from the lateral onto his lands.

5. **INSTRUCTIONS: Declaration of Law: Declaration of Law Held not Erroneous as Assuming Facts.** In an action to recover damages caused by damming a connecting lateral, resulting in overflow of plaintiff's land and destruction of corn crop, the declarations of law given for plaintiff by the court that if an obstruction placed in

a lateral ditch by defendant caused waters to be accumulated and backed over the land, or if it prevented the water from being drained off, the court will find for plaintiff, was not erroneous as assuming that there was evidence that the water was held on plaintiff's land by the obstruction, particularly in view of the fact that court gave declaration of law for defendant to the effect that if the damage to plaintiff's crop would have occurred even if lateral ditch had not been obstructed, the finding would be for defendant.

6. ——: ——: The Refusal of Defendant's Declaration of Law Which Omitted Essential Elements of Cause of Action, Held not Improper. In an action for damages caused by damming a lateral ditch resulting in destroying corn crop by overflow of land, the refusal of a declaration of law requested by defendant, which failed to take into account the fact that if the stopping of the lateral together with subsequent heavy rains prevented plaintiff from cultivating his corn, plaintiff could nevertheless recover, was not error.

7. NEW TRIAL: Newly Discovered Evidence: Not Error to Refuse New Trial on Ground of Newly Discovered Evidence Where the Evidence was Merely Cumulative. It was not error to refuse to grant a new trial on ground of newly discovered evidence, where the evidence was merely cumulative.

8. EVIDENCE: Appeal and Error: In Action for Damages to Corn Crop from Overflow of Land, Admission of Evidence that Levee Prevented a Creek from Overflowing, Held Proper, and if Inadmissible as Irrelevant, it Would not Justify a Reversal. In an action to recover damages for destruction of corn crop caused by damming head of a lateral resulting in overflow of plaintiff's land, it was not error to admit evidence to the effect that the levee on South side of the South lateral prevented waters of a creek from overflowing the land, and even if such evidence was irrelevant, its admission would not justify a reversal.

Appeal from the Circuit Court of Henry County.—*Hon. C. ﹒ ﹖alvird*, Judge.

AFFIRMED.

*James A. ﹖﹖﹖ks﹖ and﹖ ﹖n A. Gilbreath* for respondent.

*W. E. Owen* for appellant.

BLAND, J.—This is an action to recover damages for the damming of the head of lateral C where it connects with lateral B, resulting in the overflow of plaintiff's land and the loss of twenty-five acres of corn growing thereon. There was a trial before the court resulting in a judgment in favor of plaintiff in the sum of $375 and defendant appealed.

Defendant insists that plaintiff is not entitled to recover under the facts and this necessitates the stating of the evidence in the most favorable light to plaintiff.

During the season of 1919 plaintiff was farming, as tenant of defendant, eighty acres of land lying one-half mile east and west and one-fourth of a mile north and south. The northwest portion, twenty-five acres, was on high land and in wheat, the rest, bottom land, was in corn. The bottom land started at the southwest corner of the eighty acres, extended north a short distance and then circled to the northeast around the high land, running almost to the north side of the eighty at a point just west of the middle of the north line. The low land, consisting of fifty-five acres, was planted in corn. The land was located in the Big Creek Drainage District in Henry County, Missouri, and on the west side of Big Creek, whose course was generally from north to south. The main drainage ditch of the district ran a short distance from and along the east end of the eighty acres. Along the south side of the eighty acres was a lateral to the main ditch called lateral B. This lateral extended west from the southeast corner of the eighty acres one hundred rods where it connected with a ditch made prior to the construction of the lateral in 1911 or 1912. However, the whole of the ditch extending the full length of the south side of the eighty acres was referred to in the evidence as lateral B.

In the plan of reclamation lateral C was laid out to connect and start in lateral B about the center of the

24—211 M. A.

south line of the eighty acres, and to extend south about three-fourths of a mile into Brushy, a tributary of Big Creek. Lateral C was not completed until the fall of 1917 when it was cut into lateral B. It was not entirely completed at that time but was sufficient with lateral B to carry off the water falling on the water-shed which they drained without overflowing the eighty acres in question. In the spring of 1919 defendant filled in lateral C where is connected with lateral B, preventing water from flowing into the former.

A short distance west of lateral C a private drain was constructed by a former owner of the ground, running some distance north through the bottom land and was made for the purpose of draining surface water falling upon the eighty acres. This private drain had a valve where it flowed into lateral B to prevent the water from escaping from lateral B on to the land. The low land of the eighty acres was well tiled, the work having been done a few years prior to the overflow complained of. In digging lateral B the waste earth was thrown north and was well scattered so as not to make a very high embankment between the low land and lateral B, but leaving somewhat of a bank. Former tenants made small ditches in two or three places in this bank to drain off the water from the low land.

There is some dispute in the evidence as to the rise of the land commencing with lateral B and going back toward the north. The general slope of the low land was toward the southeast corner of the eighty acres, it having a slight rise to the north. However, there is evidence that there was what was called holes in the low land, the bottom of these places were somewhat below the natural surface of the eighty acres along its south side. There was a general fall of one foot from the north side to the south of the eighty acres in the low land. The lowest place was several feet north of lateral C. There is ample evidence from which the court could find that the twenty-five acres that was overflowed was only

a few inches above the level of the natural surface of the south side of the eighty acres.

There was a public road along the north side of the eighty; on the east side of the land there was a levee and a short distance west of the levee and near the east line of the eighty was a ditch which carried off the water coming from the water-shed north and west of the eighty. The road had been graded and ditched in such a manner that water could not flow upon the eighty from the north but went to the head of and into the ditch on the east side of the land and thence into lateral B, about the southeast corner of the eighty.

On the south side of the eighty, beginning about 300 feet east of lateral C, was a levee made by defendant who owned the land south of the eighty. This levee extended east on the south side of said lateral to the end of lateral B and thence southeasterly to Big Creek Drainage Ditch and along it for something like a mile or more. The object of this levee was to keep the overflow from the creek off of the defendant's land south of the eighty. At the time this was built defendant did not own the eighty in question and he and the owner had some words concerning the building of the levee because when Big Creek overflowed the levee would cause the water to back up through lateral B and on to the low land of the eighty acres in question. The differences between them was settled by defendant's consenting to have lateral C into lateral B. The object of lateral C was not only to have the water from Big Creek backing into lateral B to flow off through lateral C so that it would not overflow the low land of the eighty acres in question, but to help lateral B take away water from the area which lateral B drained, which was one hundred and ninety-five acres. Mr. Cunningham, the former owner of the eighty acres, testified that on account of the water backing into lateral B from Big Creek a sediment from the west was caused to flow into lateral B and dirt accumulated in the upper end there-

of, and lateral B was not taking all the water that it was supposed to drain but some of it was flowing over the eighty acres and for this reason, as well as on account of the Thomas levee, he asked that lateral C be completed by cutting it into lateral B.

On the 18th day of May, 1919, the corn was just high enough (four or five inches) to plow and plaintiff intended to start plowing it the next day but a hard rain came. When the rain was about over plaintiff went to lateral C and found, beginning fifteen or twenty feet east of lateral C, that there was water pouring over the north side of lateral B for a distance of one hundred feet toward the east. The stream flowing over it was six inches deep and at that time the water in lateral B was six inches from the top of the south bank thereof. This flooded most of the corn land to a depth of four or five inches. However, some of the corn was not entirely covered but in some of the higher places one could "see through." The creek was not overflowing at this time. Some of this water remained upon the land for several days but much of it ran off as the water on lateral B ran out. The next day plaintiff and the ditch commissioner spaded ten or twelve ditches through the embankment on the north side of lateral B, allowing some of the water to flow off of the land, but plaintiff testified that much of the water remained on the land for several days. In order to have drained all of the water it would have been necessary to go back north for quite a distance and use a plow in ditching. Plaintiff testified that he was unable to do this because it was too muddy to drive a team on to the land.

On the night of the 19th and morning of the 20th of May, 1919, plaintiff and the ditch commissioner removed the obstruction at the mouth of lateral C. There were a few bright days following the 18th day of May and plaintiff started to plow the ground that had been first drained off and had about completed plowing the corn in this land (fifteen or twenty acres along the east

side of the eighty and the remainder on the west side of the low land) when another heavy rain came about May 28th, stopping the plowing for several days. On account of the wet condition of the remaining unplowed land plaintiff was unable to cultivate it, resulting in it growing up in grass and weeds and the corn turning yellow and becoming valueless. He did cultivate the remaining thirty acres and raised a good crop of corn thereon. However, plaintiff stated that the "ground was always wet" when he plowed the part he saved. The evidence shows that there was much wet weather during the plowing season. Although the rain of the 28th was a heavy one it did not overflow the land. The dam in later C had been removed.

The watershed drained by the ditch along the east side of the eighty was one hundred and seventy acres, and, as we have before stated, that drained by lateral B was one hundred and nine-five acres. Defendant's engineer gave the capacity of the two ditches which would indicate, as defendant contends, that lateral B had five to ten times the capacity as the ditch along the east side and, therefore, defendant urges that a great quantity of water must have overflowed this land from the north. We will hereinafter discuss defendant's contention that no water overflowed from lateral B. The petition alleges that the damage was caused by the stopping up of lateral C. However, all of the evidence does not agree with the measurements of the engineer, showing that lateral B did not have the capacity that defendant contends. The first station at which defendant's engineer took his measurements of the capacity of lateral B was 200 feet east of the southwest corner of the eighty acres; the next was 250 feet west of the end of lateral C, and the next 200 feet east of the end of lateral C. It will be noted that he did not take any measurements in the immediate vicinity of lateral C, while there was testimony that immediately east of lateral C lateral B had filled up some and the bottom of lateral C was lower than that

of lateral B; that the ditch on the east side of the land was as large as lateral B where plaintiff saw the water flowing on his land on the morning of the 18th day of May. So that the comparative capacity of the two ditches is not what defendant contends. But there is no question but that the capacity of lateral B was much greater than that of the ditch on the east side of the land. However, the evidence shows that along the east ditch and near the north side of the eighty was a lake covering three acres of ground. When the ditch on the east side got full enough the water backed into the lake and it would take several hours for it to drain out of the lake. At the time of the rain of the 28th the water stayed in the lake and did not run down over the bottom land. The capacity of this lake is not shown in the evidence but unquestionably it helped to prevent the overflow of the low land by water coming from the north.

Defendant calls our attention to testimony that the rain of the 28th caused such a volume of water on the north road that it came up to the axle of an automobile standing thereon and necessarily the water must have flowed over the land from the road, but this testimony was contradicted and there is ample evidence from which the court could find, although there was evidence to the contrary, that no water from the north overflowed the land on the occasion of either of these rains. Defendant stresses the point that there was no crop of corn lost on the land in question from the time of the digging of lateral B in 1911 or 1912 to the year 1919 except from overflow from the creek. There is evidence to this effect and also evidence that in 1916, 1917 and 1918 the seasons were dry and that prior to that time there were at least three ditches cut from the land into lateral B so that anything but a large body of water would rapidly flow back into lateral B. And, of course, water standing on corn for a short time does not kill it. From the testimony of Cunningham there is no question but that water flowing from the watershed which lateral B drained

was caused to flow over the low land on account of lateral C not being opened up, and in order to prevent this and also afford a means of draining the overflow water from the creek he asked that lateral C be opened up. There was expert testimony that lateral C was necessary for these purposes. The evidence is that after lateral C was opened up there was no trouble from water from either source overflowing the low land.

Defendant contends that plaintiff was guilty of contributory negligence in filling up the openings into lateral B from the low land. However, we do not think that we could say this as a matter of law. Plaintiff gave as a reason for filling up the ditches that he wanted to prevent water from flowing from lateral B on to the land, and Cunningham testified "One of these ditches gave us a lot of trouble . . . on account of when back water would flow in and fill it, sometimes two feet of water in there, before it receded." He testified that when the water ran out from the land it cut a channel in these ditches, and evidently they had become much larger and deeper than when originally constructed or were ever intended to be. One had washed so that it was two feet deep. If the plan of reclamation proved successful there was no occasion in having these ditches to drain water off the land. No water came from the north of the land and the water that fell upon it would be taken care of by the tiling and the drain which ran into the land and emptied into lateral B a short distance west of lateral C. Now, of course, plaintiff could not be held blameless for filling in these ditches if he knew that the stoppage of lateral C would overflow his land and that the ditches in that event were necessary to drain the land, but there is no evidence that he knew this or at best it does not conclusively so appear.

Defendant makes much of the testimony of engineers to the effect that at the point where plaintiff testified he saw water running on to his land on the morning of the 18th of May, the top of lateral B on the north and

south side was practically on the same level, if the south side was not slightly higher, and that if the water in lateral B got high enough to overflow that it would run out toward the south. Plaintiff said that it was on account of the south bank being higher than the north that caused the water to be thrown on his land. It was for the court, sitting as a jury, to weigh the testimony. Although plaintiff's testimony is denied by the engineers who made the actual measurements and calculations, it is not for the appellate court to say that their testimony should be believed rather than that of plaintiff. However, there is testimony that after the embankment was built by the defendant along the south side of lateral B, which extended to a point 300 feet east of lateral C, the creek rose and backed into lateral B and over the low land and that the water stood thereon to a depth of two feet and that at that time lateral C was not opened. It is admitted that there was a small hillock extending about fifteen feet east from lateral C making the north bank lower than this fifteen feet of the south bank of lateral C. Defendant in building the dike along the south bank of lateral B intended to keep the water off of his land. Had it been possible for the water to back into lateral B and overflow the space between the hillock and the end of the levee, defendant undoubtedly would have extended the levee to the hillock or to lateral C. The fact that water stood two feet deep on the low ground to the north of the area between the end of the levee and the hillock and did not flow through this area from lateral B but remained on the ground until it flowed out through lateral B, is almost conclusive evidence that the north bank of lateral B was lower than the south bank.

It is insisted that it was the continued wet weather preventing plaintiff from cultivating the corn that caused the loss. In this connection defendant again insists that the ground must have been badly flooded by the rain of May 28th on account of the great volume of water said

Patten v. Thomas.

to have been running out of the road onto the north side of the eighty acres, and the apparent incapacity of the ditch along the east side to carry off this water even if all of it got as far as the ditch. We have already discussed this matter and decided that there is ample evidence that none of this water flooded the land. While no doubt the land where the corn was lost continued wet to such a length of time that plaintiff was unable to cultivate it, and in fact plaintiff admits this, plaintiff testied that he intended to cultivate this corn the day after the overflow of May 18th, that day being Sunday, but was prevented by the overflow from immediately so doing. The record is not clear as to whether he could have cultivated the entire tract of corn between the two rains had the first one not overflowed his land. But be that as it may, there is no question but that the overflow of May 18th rendered plaintiff's ground where the crop of corn was lost wet for several days. Even though subsequent rains contributed to the occasion of plaintiff's being unable to cultivate the corn, yet defendant would be liable if the stopping of lateral C causing the overflow on May 18th was one of the proximate concurring causes. [Grubb v. Dunham, 201 Mo. App. 504, 509; Bailey v. Wabash Ry. Co., 207 S. W. 82.]

Defendant complains of plaintiff's declaration of law in which the court declared that if by the obstruction in lateral C, placed there by the defendant, "the waters were caused to be accumulated and backed over or held on the land in controversy or prevented said water from being drained off, . . . the court will find for plaintiff." Defendant objects to that part of the instruction which assumes that there was evidence that the water was *held* on plaintiff's land by the obstruction in lateral C. Defendant insists that it is common knowledge, there being no flooding of the creek, that water in such a ditch as lateral B would soon run out after a hard rain even though lateral C was obstructed. From this fact defendant argues that the giving of plaintiff's declaration shows

that the court decided the case on an erroneous theory of the physical facts. The court also gave for the defendant a declaration that if the damage to plaintiff's crop would have occurred even if lateral C had been open, the finding would be for the defendant, and that there could be no finding for plaintiff on account of surface or hill water accumulating and standing on the land except such damage as was caused to the crop by "additional waters, if any, that were caused to accumulate and stand thereon, as the result of stopping and damming of said lateral C, and from the rain of the 18th day of May, 1919."

We think after reading all of the declarations that the court did not decide this case on an erroneous theory as contended by the defendant. Perhaps plaintiff's declaration could have been better worded but all of the declarations taken together fairly will show that the theory of the court was that plaintiff could not recover except for the damages done by the stopping of lateral C. It is apparent that the court could not under the declarations hold defendant liable for the holding back of water coming from the north, or the surface water falling upon the eighty acres, but only that water caused to be held upon the land by reason of the fact that lateral C being dammed did not take off the water that it was intended it should drain under the plan of reclamation. There is evidence that if lateral C had been opened no water would have flowed upon the land. And there is no question but that there was water held upon the land, not necessarily on account of the fact that water did not recede in lateral B but on account of the fact that the land was lower than the north bank of lateral B. If the stopping of lateral C caused this water to run upon the land, then it was the proximate cause of its being held there. At least we cannot say as a matter of law that it was not the proximate cause and that the alleged negligence of plaintiff in filling up the ditches running from his land into lateral B was the proximate cause.

A point is made that plaintiff failed to minimize his damages because he did not dig the ten or twelve ditches leading from his land to lateral B until the next day after the rain. However, in defendant's refused declaration No. 1 he sought to have the court declare that plaintiff could not recover at all if he failed to minimize his damages. This declaration was clearly wrong unless, perhaps, plaintiff could have prevented any damage whatever by digging the ditches immediately, but the evidence does not show this. The next day after the rain plaintiff attempted to drain off the water the best he could but was unable to successfully do so on account of the fact that it would require a team and plow to do it and he could not get onto the land with a team on account of its wet condition. It is apparent that he would not have been any more successful had he attempted to drain it the first day. How much a delay of twenty-four hours in taking off the water that he actually drained off contributed to the continued dampness of the ground is not in evidence and is a subject of speculation only. The failure to minimize the damages was a matter of defense. Such a defense should not only have been proved but a proper declaration should have been asked concerning it.

The court did not err in refusing defendant's requested declarations Nos. 1 and 2. We have already ruled that his declaration No. 1 was improper but in addition to this the last paragraph of declaration No. 1 and declaration No. 2 fails to take into account the fact that if the stopping of lateral C together with the subsequent heavy rains to that of May 18th caused plaintiff to be unable to cultivate the lost corn, nevertheless, plaintiff could recover. [Grubb v. Dunham, supra; Bailey v. Wabash Ry. Co., supra.]

It is insisted that the court erred in refusing to grant plaintiff a new trial on the ground of newly discovered evidence, but this evidence consisted of surveys made by engineers showing that the south bank of lateral B

at the point plaintiff testified he saw the water running over his land, was on the same level as the bank on the north side. This was merely cumulative evidence and we cannot convict the court of error in refusing a new trial. [Summers v. Met. Life Ins. Co., 90 Mo. App. 691.]

The court did not err in admitting testimony to the effect that the levee on the south side of lateral B held back the water from the overflow of Big Creek on to the land in question. This was necessary for a complete understanding of all the facts in the case and even if irrelevant its admission would not justify us in reversing the case. [Powers & Boyd Cornice & Roofing Co. v. Trust Co., 146 Mo. App. 36, 56, 57.]

The judgment is affirmed. All concur.